Well, good morning, Mr. Greenspoon. Good morning, Your Honor. You sneaked up on me. I was so busy here working. Go ahead. You may proceed. We're all caught a little by surprise, I think, Judge. That's right. But, Your Honor, may it please the Court, yesterday the Court heard the criminal side of this case, and Judge Riley, Your Honor, called it a complex case. This one today is quite a bit simpler. Here, the District Court erred in raising the pleading bar in a civil case to be so unapproachably high that pleading facts probative of actual knowledge and substantial assistance did not amount to a pleading of aiding and abetting liability under Rule 8. So the receiver asks for reversal. In defending the judgment, Your Honors, the bank repeats an unexplainable error from the Court below, which you find in the appendix at page A-8. The bank states, and this is a direct quote from page 14 of their brief, that there is no direct allegation of knowledge. And I respectfully commend Your Honor's attention to the complaint at A-48, A-75, A-78, perhaps other places, each of which proves them wrong. It says in each of those spots, three times at least, Associated Bank had actual knowledge of the fraud. And before we hear from my brother on the other side about how that's simply a formulaic recitation of the cause of action, before we even get to the plausible facts supporting that allegation, page 7 of our reply brief cites the authority showing that an allegation of knowledge such as this is a purely factual allegation entitled to full dignity as a pled fact when evaluating Rule 8 and Rule 12. It must be assumed as true at this stage. And, of course, the complaint has so much more. So on this, on the knowledge point and on substantial assistance, which, by the way, both sides agree have to be evaluated in tandem under Minnesota law, the Wittman decision, the bank repeats another district court misimpression. This is one we find in the appendix at A-11. The bank states, quote, roughly a quote, all the receiver alleges is mere maintenance of a bank account, receipt or transfer of funds, or repeated executions of wire transfers. This is the bank's isolation or recharacterization of what the receiver has pled. And I respectfully commend Your Honor's attention to where the record contradicts this litigating position. A-44 and 57-59, bank falsification of account opening documents. A-73, falsification of remitter lines on cashier's checks. Cashier's checks, Your Honors. These are documents in complete control by a bank. And that falsification lent the appearance of segregated accounts to the victims of the fraud. A-57 to 59 again, falsifying account designations as for operating funds, not investor funds, to escape enhanced due diligence status, and to sidestep the fiduciary duties, make the recognition of fiduciary duties that much harder. A-56, visits to the scheme's place of business where the bank officer's brother worked, where we know from yesterday that that person would have encountered a drug miasma. A-43, offering advice on how to avoid bank regulator detection. A-60 to 61, against policy, against the bank's own internal policies, sending an off-site deposit machine to a non-account address. This is one of those machines where you can dump a bunch of checks in the hopper, and they will automatically process as deposits into the depositor's accounts. The banks are very careful about, ought to be very careful about how those machines get distributed. In this case, that care was not there. A-49, letting accounts stay open after whistleblowers in the bank found irregularities. A-70 to 71, letting accounts stay open after learning that the Swiss government had liquidated the scheme's sole investment vehicle. Lots of the transactions that we identify in our briefing happened after Crown Forex S.A. had been liquidated by the Swiss government, and the bank knew it. And then finally, A-46, 67 to 69, 77 and 80, and probably elsewhere. This is the clincher. Letting Cook, the mastermind, have complete dominion, complete and total control, over the investment funds, again and again, when they knew that he was not an owner of the account, and they knew that he was not a signatory on the accounts. These all, Your Honors, they defy characterization, which we see in the red brief, as missed red flags, ordinary banking procedures. These were all overlooked by the district court, and they're all sidestepped in the red brief. And I want to close, Your Honors, if you'll allow, with a discussion of the seminal Eighth Circuit decision on pleading standards. And Judge Riley, all of your honors are familiar with it, but of course, Judge Riley, you sat on the panel for Braden v. Walmart stores. And in Braden v. Walmart, we have this circuit's interpretation and application and instruction to the district courts about how to apply Ashcroft v. Iqbal, Twombly v. Bell Atlantic. The bank never cites Braden v. Walmart stores. The bank never addresses it in their brief. And to me, that's almost understandable, because under Braden, the question of plausibility of a claim, and that's really what we're here to evaluate, which, by the way, is the lowest standard in our civil justice system. But the evaluation of plausibility of a claim comes down to this. Do the alleged facts as a whole, taken as true, and not sliced and diced to parse them one by one, do they lead to a reasonable inference of liability? The court uses common sense. The court uses its judicial experience. And the court will not demand that an alleged fact or that the alleged facts as a whole rule out all lawful explanations. The court will not dismiss when the facts are merely consistent with an excuse or a lawful explanation. To sum up, even the highly improbable passes the test and gets at least to the discovery stage. This case, Your Honors, is simply a repeat of Braden v. Walmart in the sense that the district court overlooked this framework. It deserves the same outcome, and, Your Honors, we would respectfully ask for a reversal for further proceedings in the district court. And with your permission, I'll reserve the rest of my time for revolve. Well, you can't reserve all of it. You only reserve a third, but you can reserve five minutes. I will take everything you allow me. Thank you, Judge. Okay. Thank you. Mr. Rothfeld. Mr. Rothfeld. Good morning. Good morning, Your Honors. I am Charles Rothfeld, Mayor Brown, representing the Appley Associated Bank. This morning, the court has heard allegations of serious misconduct on the part of the bank, and I have two principal points to make in response. The first concern is the legal standard that governs here, and that is the standard of actual knowledge. In order to prevail, the receiver has to demonstrate that the bank actually knew that fraudulent . . . Well, at the pleading stage, you have this vice president. Is it pronounced Lean? Yes, Lean Sarles. Lean Sarles. Do they have to say that he was high enough . . . You know, banks have officers. In fact, everybody down to the custodian is an officer, but why just with his title isn't that enough to say that that's going to be imputed to the bank? Well, it could well be imputed if, in fact, he had actual knowledge, but we think it's clear that he didn't. He . . . Well, but he understood. He knew who the signatories were. I mean, that's the allegation, that he knew who the signatories were to the account, and he also knew that somebody who was not a signatory was taking money out. Well, I guess we have to look at two things. What exactly did he know, and did he know that that was a fraudulent act and a violation of duty? I would hope a bank wouldn't let somebody take something out of my account that wasn't a signatory. Isn't that just basic banking? That may well be, but as a matter of banking practice, it may well have been a sloppy thing for him to have done. But in the context in which there were a number of people who were operating in this business, they were all operating together, there were a number of accounts, they were all operating these accounts, that Mr. Cook, the person who I think you're referring to, the people at the bank knew that he had issued directions to people who did have signatory authority and that those people then followed his directions and transferred the funds. So I think it was understandable for people. But is that in the pleadings? I mean, we're just here at the pleading stage. They're saying they may not be able to prove it, but we're just looking at the pleadings. I understand you have answers to everything they say, but so what in the pleadings at this stage answers your question? Well, I'll say two things about that. First of all, this is an unusual case in the sense that the receiver is unusually well situated. He has obtained substantial discovery already from the bank through his third-party actions against other defendants, and so he has . . . That's in the pleadings? I think it's clear that there's no doubt from his complaint that he has obtained these materials through discovery, and he knows essentially everything he's ever going to know about what happened here. If he can't demonstrate now that the bank was aware of fraud, he's never going to be able to do it. So he is very well situated here to begin with. Second of all, Mr. Sarles submitted an affidavit, which the receiver attached to his complaint. So I think it is part of the pleadings, and the court can take it into account, in which he says very clearly that he had no concept that fraud was taking place here, that he engaged in sloppy banking practices, and there's no question that he did. But there's a huge difference between negligence, sloppiness, and actual knowledge of fraud. And again, it is actual knowledge that is the crucial point here. This court has said on multiple . . . Well, what about the fact that at least the allegation is that he knew that these were investors' funds that were being moved from . . . and there's some allegations about whether this account was really a legitimate account, changing the name of the company and so forth. But anyway, the allegation is that these were investor funds, and they were moving to personal accounts. That's the fraud. I mean, that's the underlying fraud of this whole scheme. So why is . . . if the allegations are true, why isn't that sufficient, at least to be plausible, that he had enough knowledge to be . . . and enough title and authority to make a question where the bank should have not allowed it? Well, the question is whether he knew, whether he actually knew, not whether he could have thought maybe, whether he could have suspected, but whether he actually knew that fraud was being committed here. And the fact is that . . . I'm not . . . you're using that in the abstract. I'm saying factually they allege that he knew that there were investor . . . these were investor funds, and they were moving to personal accounts. That's right, Your Honor. But that is not necessarily a hallmark of fraud. The fact is these people . . . Well, it isn't. No, well, for these reasons, Your Honor. First of all, it was thought that these people were running investment funds, and it is logical to think that funds are going to be transferred from one account to another. It is perfectly legitimate. But the allegation is they went to personal accounts, and something about somebody walking out, Cook or somebody with $600 to buy himself a yacht. I mean, that with investor funds . . . If I may, Your Honor, it is often legitimate for people who are running accounts and advisory businesses of this kind to be paid out of the investment funds which are in their accounts. The SEC, as we've demonstrated in our brief, allows that to take place. And so the fact that some funds were being transferred from what were thought to be investor accounts into the personal accounts of the people running the business could well be entirely legitimate. That does not on the face of it tell us that fraud was taking place. You may be right. But doesn't that raise an issue? Isn't that a . . . Pleading has raised a plausible issue that it may not be. You know, you say it may be legitimate, but doesn't that raise an issue it may not be legitimate? Well, I think, again, what has to be demonstrated is actual knowledge of fraud. This is a fraud case, and so Rule 9 applies. There has to be specificity in the pleadings. And although state of mind can be pleaded generally, as the Supreme Court said in Iqbal, the Rule 8 standard continues to apply. The allegation has to be in context, has to be plausible. It has to be something that the court can reasonably think leads to the conclusion that's being asserted by the plaintiff. And in the context here, and when one looks at the whole set of allegations, that simply is not satisfied. And I have to emphasize that the receiver's brief states in very provocative terms what the bank is alleged to have done. If you actually look closely at the complaint, I think that those provocative allocations are simply not borne out. The things that are asserted in the brief, and there are a relatively small number of allegations which are repeated and recharacterized and restated in the brief many, many times. So you stand by what you said in your brief, that the receiver's complaint makes no direct allegation of knowledge. You're standing by that or on that? I am standing by that. Now, it is true, as Mr. Greenspoon said this morning, that the complaint states an assertion of actual knowledge. But in the context in which that is stated in the complaint, that is a legal conclusion. I mean, it is saying that given what the receiver identifies as red flags, that the bank must have known. And I think that is simply not an accurate statement of the law. And the receiver gives his game away in paragraph 74 of the complaint, in which he says that there were multiple red flags, the bank should have acted in consequence of these red flags. Had it done so, it would have uncovered the Ponzi scheme. And had it done that, it would have shut it down. That's the opposite of actual knowledge of fraud. That's saying that if there had been actual knowledge, the bank would have shut down the scheme. And Judge Doty in the district court, who of course looked very closely at these allegations, he ran through the allegations of the complaint in considerable detail, in his opinion, he said that is what is happening here. The allegations are that there are red flags, there were suspicious activities, but there is no actual allegation in context that there was actual knowledge of fraud on the part of the bank. And that's what has to be demonstrated. This Court has said probably a half . . . It gets back to why is it not fraud to move money out of an account that you know investors' money or funds that belong to other people and move them, huge sums of money, into personal accounts and personal uses of people by someone that's not even a signatory to the account. Why is that just in and of itself fraud? Because there may well . . . Let me put it this way. It should make it that that is plausible allegation of fraud. Well, I'll say two things about that. First of all, even granting that there may not have been legitimate reasons for doing it and that one might have known that there might . . . It's a possibility that there were not legitimate reasons for moving the money. There has to be actual, now, actual subjective awareness that fraud is taking place. And it may be, even if it were the case, Your Honor . . . Well, that's what I'm giving you. The fraud is they're stealing money from people. They're defrauding people. In other words, they're taking their money, investors' money. And they're alleging that this bank vice president knew that they were doing that, knew that they were taking money from investors' accounts and putting it in their personal accounts or cashing it, walking out with people who were not even signatories on the account. And why is that not, in and of itself, fraud, that it's occurring right under the nose of the bank and they're allowing it? I guess the question we have is that they know about it. They know that those acts are taking place. Well, I think it is not on the face of a fraud for the reasons that I said before. There are legitimate reasons why funds can be moved out of investor accounts. I agree with you. I agree with you. But . . . And if I . . . But it's the question of plausibility. They're alleging that they knew that these were acts of fraud. And that's your defense. You're telling me your defense. Well, there are other reasons that this could be. And I'm on the pleading stage. Well, I recognize that, Your Honor, but I think that the allegation is sort of the simple fact that this happened. The fact that it happened is what they are taking to mean subjective awareness that it must have been fraud and illegitimate. And I think our response is the simple fact that it happened, it does not tell you necessarily that it's fraud. It does not give you subjective, actual knowledge. In your view, to satisfy the Supreme Court's pleading standard, must they have come forward with a copy of an e-mail from Mr. Sarles or a document or a letter or some overheard phone conversation? No, it certainly is possible that circumstantial evidence can be used to establish knowledge. It's not absolutely required that there be a confession of fraud. But it has to be that in the circumstances that you as the judge are left persuaded that there must have been actual subjective knowledge. Again, this Court has said . . . Judge Goldman asked a very good question. Let me pursue that. What more could they have alleged to allege actual fraud, a knowledge of actual fraud by Mr. Sarles? I think that if they . . . certainly if he had been involved in the fraud himself and was aware of the nature of the Ponzi scheme, if he were aware that there were no investments that were being made, if he were aware that there was actual sort of wrongful conduct that was going on that he had seen, that he had been informed about. But all that he knew . . . And again, I urge the Court to look closely at the allegations in the complaint, not as they are recharacterized in the briefs to this Court. The allegations of the complaint show that what happened here were essentially ordinary banking transactions. The money was moved into accounts, was transferred between accounts, in sort of the usual sort of way. Unless one knew for sure, unless one was told that wrongful uses were being made of these funds, in the bank you would have no idea. The fact is that banks are not expected to look into the businesses of their clients, even when banks are suspicious. Banks are expected not to allow people that are not signatories to accounts to take money out of those accounts. That goes back to the founding of the first bank in the world. That is true, Your Honor, but that is not the nature of the fraud here. That is sort of slippy banking practice. Well, the addition factor, and I'm beating the horse to death here, is that they knew these were investors' funds. They knew that these were investor monies and that they . . . But they did not know, Your Honor, that the people who were running the scheme were not entitled to take these funds because there could very well have been reasons why they would and why it was legitimate. The fact that they could have suspected that it was not legitimate if they did, and there's no indication. Mr. Sarles, who again submitted an affidavit attached to the complaint, so it has to be taken as true, says that he had no idea that there was any wrongful conduct that was going on. Even if he had suspected it, that is not good enough. That is not actual knowledge. Red flags are not actual knowledge, constructive knowledge, as the courts have said, as the Minnesota Supreme Court said in the Witsman case. It's not good enough. They are an indication that what happened in this case was not in accordance with the usual banking standards. Would you concede that? I would concede that there was sloppy banking practice here, but that . . . At what time does sloppiness merge over into illegality? Only when there is actual knowledge of . . . Well, that's your point. That's your point. Well, it's not my point, Your Honor. Well, I mean the law's point, and I guess . . . It's this Court's point, restated repeatedly. It's the Minnesota Supreme Court's point, articulated as the standard. And, again, I would urge the Court to recognize two things. First of all, if one has a looser standard, I mean if one says, well, it could be that there was no legitimate use to transfer the funds from one place to another. If you put businesses in that position, they become the guarantors of the honesty of their customers and their clients, which is an impossible position to be in. And for banks in particular, Your Honor, banks are obligated under Minnesota law, as they are in the law of all jurisdictions, to execute customer transactions as asked, quickly and efficiently. What they are expected to do, if they have any suspicion that there is wrongdoing, is not to shut it down. What they're expected to do is file a suspicious activity report with the federal government so that law enforcement authorities can look into it and determine whether or not there actually is something fraudulent going on. Well, that all started the allegations, but I'm familiar with that. I've represented some banks, and I know they have to report these things. And that may come up in your case if they reported this. And I don't know if they did or they didn't. Well, we can't say whether they did because it is a confidentiality. Part of this policy is a policy of secrecy, that one is not supposed to, as the bank, tip off people who are suspected of wrongdoing. What you're supposed to do is keep that confidential. You have to keep it confidential as a matter of law. You tell federal authorities, they investigate. And if they find wrongdoing, they uncover it and shut it down. That, in fact, of course, is what happened here. Your time has more than expired. I appreciate your indulgence. Thank you, Your Honor. Thank you very much. Five minutes. I hope a lot less than that. Just very briefly, Your Honor, all that we heard just now is knowledge of the fraud, knowledge of the fraud, knowledge of the fraud. But Wittsman, the Minnesota case with the standard, says knowledge of the breach of duty. And we actually have four counts here. Only one of those counts is fraud. Count two is for aiding and abetting conversion. So we don't even get to these lofty, high-minded thoughts about Rule 9b and particularity when we talk about conversion. And as Your Honor was perhaps reflecting on, when one moves monies that are supposed to be under the dominion of one person and you allow them to be moved to the dominion of somebody to whom they don't belong, well, that's conversion. Again, very briefly, the receiver does not know everything. As I understand it, there was one subpoena that was contested. Documents had to be pried out. There were no depositions. That will be forthcoming in discovery. And then finally, banks are expected to shut down a fraud when they learn about it. We know that from the very record in this case where there are threats by the whistleblowers who are silenced within the bank. There were threats by the whistleblowers to have the accounts frozen. And as we explained it in our briefing, that's a poignant demonstration of what could have happened, what the bank could have done, if the bank were acting innocently and not aiding and abetting the conversion, the breach of fiduciary duty, the negligent misrepresentation, and the fraud. If there are no questions, Your Honors, thank you very much. Okay. Thank you very much. I liked this trend today with shorter arguments. Thank you. Thank you both. And Mr. Rothfeld, you did very well asking some difficult questions, so thank you for that. I appreciate it. And we'll take it under advisement and be back in due course. Thank you.  Thank you.